UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| CARL RISING-MOORE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:03-CV-1813-SEB-VSS |
| | ) | |
| THOMAS WILSON, CITY OF | ) | |
| INDIANAPOLIS, | ) | |
| Defendants. | ) | |

**ENTRY DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff filed suit pursuant to 42 U.S.C § 1983 against Defendants contending that

he was arrested without probable cause and was subjected to excessive force, in violation

of the Fourth Amendment to the United States Constitution.  Plaintiff also claims that

Defendants' actions constituted false arrest and battery under Indiana state law.

This matter comes before the Court on Defendants' Motion for Summary

Judgment on all of Plaintiff's federal and state claims.  For the reasons outlined below,

we now <u>DENY</u> Defendants' Motion for Summary Judgment on all of Plaintiff's federal

and state claims.

<u>Introduction</u>

Plaintiff Carl Rising-Moore ("Rising-Moore") has sued Officer Thomas Wilson

("Wilson") of the Indianapolis Police Department ("IPD") and the City of Indianapolis

("the City")[1] under 42 U.S.C. § 1983 for violating his Fourth Amendment rights.  The claims arise from events that took place during a political protest in conjunction with President George W. Bush's ("the President" or "President Bush") visit to Indianapolis on May 13, 2003.  Rising-Moore has also filed pendent state claims for false arrest and battery.[2]

Section 1983 establishes civil liability for "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.

Rising-Moore alleges that Officer Wilson lacked probable cause to arrest him and used excessive force in effecting an arrest when he tackled Rising-Moore to the ground and pinned him there for ten minutes.  Rising-Moore further alleges that Officer Wilson's actions constituted false arrest and battery under Indiana state law.  Officer Wilson rejoins that he acted reasonably under the circumstances, or, in the alternative, is entitled to qualified immunity for his actions.  Moreover, Officer Wilson claims immunity from tort liability for the state claims under the Indiana Tort Claims Act ("ITCA").

---

[1]  Officer Thomas Wilson is sued in his individual capacity on the § 1983 claims and the City on the state law claims under the doctrine of respondeat superior.

[2]  Plaintiff has sued the City only on the state claims.

2

Factual Background

On the morning of May 13, 2003, the President was scheduled to make a campaign appearance at the State Fairgrounds in Indianapolis, Indiana, traveling there by motorcade.  Pl.'s Ex. 11: Rising-Moore Dep. at 22.[3]  Officer Wilson was working as an IPD motorcycle officer on the security detail for the presidential motorcade.  Defs.' Ex. B: Wilson Dep. at 6-7.  That same morning, Rising-Moore joined a group of approximately twenty other people at the intersection of 38th Street and Fall Creek Parkway in Indianapolis to protest President Bush's decision to go to war with Iraq.  Pl.'s Ex. 11: Rising-Moore Dep. at 22-23, 25.

For many years prior to this event, Rising-Moore had been involved in nonviolent political protests and social activism.  Pl.'s Ex. 11: Rising-Moore Dep. at 13-14.  In fact, Rising-Moore alleges that he has become something of an unofficial liaison between the public and the IPD in assisting with security during war protests.   Id. at 14.

Though various IPD officers, in addition to Officer Wilson, were assigned to President Bush's security detail, the Secret Service had responsibility for overall management of security during the President's visit.  Defs.' Ex. B: Wilson Dep. at 25.  As part of the morning briefing, the Secret Service had instructed Officer Wilson and the other IPD officers on that detail that members of the public were not to come out into the street or run with the motorcade, that cameras were not allowed to "pan" the motorcade,

_____

[3]  In citing to the record, we designate which party has submitted the exhibit because Defendants submitted only portions of various depositions.

3

and that the public was to remain in a fixed position as the motorcade passed.  Id.  Despite this briefing by the Secret Service, neither Rising-Moore nor any of the other protestors in his group were specifically instructed or ordered to stay in one place or to refrain from walking or running down the sidewalk.  Pl.'s Ex. 15: Rising-Moore Aff. at ¶ 6.  Before the motorcade arrived at the intersection of 38th Street and Fall Creek Parkway, an unidentified female law enforcement officer had instructed Rising-Moore and his fellow protestors to move from the southwest corner of the intersection to the northwest corner. Pl.'s Ex. 11: Rising-Moore Dep. at 25-26.  This officer did not give any reason for her instructions, but Rising-Moore and the others complied and crossed the street.  Id.

The President's motorcade traveled northeast on Fall Creek Parkway on its way to the Fairgrounds, and then turned west onto 38th Street.  Id. at 27; Pl.'s Ex. 12: Tripp Dep. at 12; Defs.' Ex. B: Wilson Dep. at 19.  Once on 38th Street, the motorcade traveled in the lane closest to the center of the four lane street.   Pl.'s Ex. 11: Rising-Moore Dep. at 28; Pl.'s Ex. 13: Virt Dep. at 29.

As the motorcade progressed westward on 38th Street, Rising-Moore, who remained on the sidewalk area and out of the street, began to "trot" alongside the President's limousine.[4]  Pl.'s Ex. 14: Wilson Dep. at 19-20; Pl.'s Ex. 12: Tripp Dep. at 21 (describing Rising-Moore's movement as a "quick walk").  As he moved, Rising-Moore

---

[4]  Rising-Moore knew which vehicle the President was in from hearing an earlier news report.  Pl.'s Ex. 11: Rising-Moore Dep. at 27-28.  Also, Rising-Moore claims he made eye contact with the President and made an effort "to keep his eye" as the President passed by.  Id. at 28.

4

waved a United Nations ("UN") flag[5] that was attached to an eight-foot-long wooden pole (approximately one inch by two inches in thickness).  Pl.'s Ex. 11: Rising-Moore Dep. at 29.  The flagpole extended to some extent into the street right-of-way as Rising-Moore continued to wave it back and forth.  Pl.'s Ex. 14: Wilson Dep. at 32; Pl.'s Ex. 11: Rising-Moore Dep. at 29.

As the motorcade progressed to the Fairgrounds, Officer Wilson's job, as a motorcycle escort, was to provide a physical barrier between the motorcade and unsecured side streets, alleys, parking lot entrances, and spectators.  Defs.' Ex. B: Wilson Dep. at 20, 22.  When the motorcade neared the intersection of 38th Street and Fall Creek Parkway, Officer Wilson "peeled off" from the motorcade at the northwest corner of the intersection near Rising-Moore and the group of protestors.  Defs.' Ex. B: Wilson Dep. at 17.  Seconds later, Officer Wilson saw Rising-Moore begin to trot alongside the President's limousine on the north side of the sidewalk while waving his flag.  Id. at 19-20.  Pl.'s Ex. 11: Rising-Moore Dep. at 30.

Other IPD officers working the security detail for the motorcade reported that Rising-Moore was no more than five feet from the President's limousine at this point (Defs.' Ex. C: O'Connor Dep. at 10.), and "the flag he was carrying was in the street."  Defs.' Ex. D: Tripp Dep. at 18.  Officer Wilson reported that Rising-Moore was on the

---

[5]  Rising-Moore reportedly carried the UN flag in an effort to "send a message to the President that there was support among the American people for the UN's position in support of continued weapons inspections in Iraq and against the United States invasion of that country."  Pl.'s Ex. 15: Rising-Moore Aff. at ¶ 7.

verge of entering the street (Pl.'s Ex. 2: IPD Report at 2), and his flagpole extended probably a few feet into the street.  Pl.'s Ex. 14: Wilson Dep. at 32.  Rising-Moore admits the possibility that the flagpole "may have been over the curb but not very far at all, if at all."  Pl.'s Ex. 11: Rising-Moore Dep. at 29.  Nonetheless, as both parties agree, Rising-Moore never stepped off the curb and into the street.  Defs.' Br. in Supp. of Mot. for Summ. J. at 2 ("Rising-Moore did not step into the street"); Pl.'s Ex. 12: Tripp Dep. at 17 ("[Rising-Moore] never steps down to the street");  Pl.'s Ex. 11: Rising-Moore Dep. at 30; Pl.'s Ex. 4: Kennedy Aff. at ¶12; Pl.'s Ex. 7: Zelenka Aff. at ¶8; Pl.'s Ex. 5: Below Aff. at ¶ 7.

While positioned between the spectators on the sidewalk and the passing motorcade, Officer Wilson received a command over his radio to "take [Rising-Moore] out."  Defs.' Ex. B: Wilson Dep. at 20.  Officer Wilson contends that in response to that directive he dismounted his motorcycle and yelled to Rising-Moore to "stop and get back."  Id. at 22.  However, Rising-Moore and several witnesses deny having heard any verbal order from Officer Wilson.  Pl.'s Ex. 11: Rising-Moore Dep. at 34; Pl.'s Ex. 8: Johnson Aff. at ¶11 ("no one yelled at [Rising-Moore] to stop his actions"); Pl.'s Ex. 4: Kennedy Aff. at ¶15 ("the policeman . . . never said anything after pulling to the curb and before tackling Mr. Rising-Moore"); Pl.'s Ex. 6: Lucas Aff. at ¶ 7 ("no more than 10 feet away . . . I heard no one shout at anyone else in the form of a command to stop").

Because Rising-Moore continued to trot alongside the President's limousine, Officer Wilson chased after him on foot.  Defs.' Ex. B: Wilson Dep. at 23.  According to

Rising-Moore, he did not realize that anyone was chasing him until he "felt or saw . . . something coming up quickly on [his] left."[6]  Pl.'s Ex. 11: Rising-Moore Dep. at 31.  By now, Rising-Moore estimates that he was approximately ten car lengths from the President's limousine.  Pl.'s Ex. 11: Rising-Moore Dep. at 31.   When Rising-Moore sensed Officer Wilson approaching him rapidly, Rising-Moore reacted by quickly side-stepping the officer to avoid being hit from behind.[7]  Pl.'s Ex. 11: Rising-Moore Dep. at 31, 32.  As a result, Officer Wilson's attempted tackle was deflected and he hit the ground.[8]  Id. at 31.  Realizing then that a police officer had tried to tackle him, Rising-Moore took a few steps onto the grass, knelt on the ground, and raised his hands above his head "as far as possible."[9]  Id. at 32, 36-37;  Pl.'s Ex. 9: Inman Aff. at ¶ 8 ("Mr. Rising-Moore then appeared to have recognized that it was a police officer, and immediately sat down on the grass . . .").  Rising-Moore faced north with his back to both the sidewalk and Officer Wilson.  Pl.'s Ex. 11: Rising-Moore Dep. at 36.

Officer Wilson recounts a significantly different series of events.  According to

---

[6]  A fellow protestor reported that it appeared that Rising-Moore did not know a police officer was chasing him.  Pl.'s Ex. 8: Johnson Aff. at ¶ 11.

[7]  Rising-Moore claims that he moved to the right (Pl.'s Ex. 11: Rising-Moore Dep. at 31, 33), but Officer Wilson contends that Rising-Moore moved to the left.  Defs.' Ex. B: Wilson Dep. at 27-28.

[8]  Rising-Moore claims that Officer Wilson landed on the sidewalk (Pl.'s Ex. 11: Rising-Moore Dep. at 31), but Officer Wilson recalls landing on the grass to the north of the sidewalk.  Defs.' Ex. B: Wilson Dep. at 27-28.

[9]  By the time Rising-Moore was on the ground, the President's motorcade had already passed.  Pl.'s Ex. 13: Virt Dep. at 44; Pl.'s Ex. 12: Tripp Dep. at 23.

Officer Wilson, he grabbed Rising-Moore's left arm when he caught up with him.  At that point, Rising-Moore turned and with his right hand hit the left side of Officer Wilson's face.[10]  Pl.'s Ex. 14: Wilson Dep. at 34; Pl.'s Ex. 2: IPD Report.  Officer Wilson fell to the ground, but not from the force of Rising-Moore's alleged blow.  Pl.'s Ex. 14: Wilson Dep. at 35-37.  Rising-Moore then turned and ran back eastbound approximately ten-to-twenty feet in the grassy area north of the sidewalk.  Id. at 37-38; Pl.'s Ex. 2: IPD Report.  When Officer Wilson caught up with Rising-Moore, Rising-Moore looked "like he was starting to either sit down or go down in some way."  Pl.'s Ex. 14: Wilson Dep. at 39.  Officer Wilson then pushed Rising-Moore "the rest the way [sic] on the ground face first."  Id. at 43.  Although Officer Wilson admits using some physical force to get Rising-Moore to the ground, he denies tackling or jumping on Rising-Moore.  Id. at 43-44.

According to Rising-Moore, Officer Wilson "jumped on [Rising-Moore] from behind and forced [his] face into the ground."  Pl.'s Ex. 11: Rising-Moore Dep. at 35.  Officer Wilson then put his knees on Rising-Moore's neck and upper back.  Id.; Defs.' Ex. B: Wilson Dep. at 45-46 ("My right knee is up on his back, and my left knee is up on the back of the shoulder blades and the back of his neck").  Although Rising-Moore does not recall much that Officer Wilson or other officers said to him, he remembers hearing

---

[10]  Several witnesses – including fellow protestors, a passing motorist, and a fellow IPD officer – report that they never saw Rising-Moore hit or attempt to hit Officer Wilson.  Pl.'s Ex. 4: Kennedy Aff. at ¶ 18; Pl.'s Ex. 5: Below Aff. at ¶ 12; Pl.'s Ex. 7: Zelenka Aff. at ¶ 12; Pl.'s Ex. 8: Johnson Aff. at ¶ 13; Pl.'s Ex. 9: Inman Aff. at ¶ 10; Pl.'s Ex. 12: Tripp Dep at 25.

the words, "protest my President."  Pl.'s Ex. 11: Rising-Moore Dep. at 69-70.

Rising-Moore claims that Officer Wilson pinned him to the ground with his knees in his back for approximately ten minutes (Id. at 38-39), a time frame which Defendants dispute.  Defs.' Br. in Supp. of Mot. for Summ. J. at 4 n.3.  A fellow protestor confirms Plaintiff's report that Officer Wilson kept his knees on Rising-Moore's neck for at least ten minutes.  Pl.'s Ex. 4: Kennedy Aff. at ¶ 16.  In contrast, Officer Wilson recalls Rising-Moore being on the ground for "[j]ust a couple of minutes at most."  Pl.'s Ex. 14: Wilson Dep. at 51.

According to Rising-Moore, he never resisted Officer Wilson's efforts to detain him and specifically informed Officer Wilson that he was not resisting.  Pl.'s Ex. 11: Rising-Moore Dep. at 36.  In fact, Officer Wilson admits that, by the time Rising-Moore was kneeling on the ground, Rising-Moore was not resisting and was complying with his orders.  Pl.'s Ex. 14: Wilson Dep. at 73-74.  Several witnesses – including fellow protestors, a presidential supporter,[11] and a motorist – seem to corroborate that Rising-Moore was passive and did not resist Officer Wilson.  Pl.'s Ex. 3: Swank Aff. at ¶ 14; Pl.'s Ex. 4: Kennedy Aff. at ¶ 17; Pl.'s Ex. 5: Below Aff. at ¶ 13; Pl.'s Ex. 6: Lucas Aff. at ¶¶ 8, 10, 11; Pl.'s Ex. 7: Zelenka Aff. at ¶ 13; Pl.'s Ex. 8: Johnson Aff. at ¶ 14.  Pl.'s Ex. 9: Inman Aff. at ¶ 11; Pl.'s Ex. 10: Frey Aff. at ¶ 15.

---

[11]  The Bush supporter, James Lucas, came forward as a witness after reading an account of Rising-Moore's arrest in the paper because he had not seen Rising-Moore do "anything violent or resistive against police."  Pl.'s Ex. 6: Lucas Aff. at ¶ 11.

While pinned to the ground, Rising-Moore claims to have repeatedly told Officer Wilson that he was in pain due to a preexisting injury to his back and neck.[12]  Pl.'s Ex. 11: Rising-Moore Dep. at 35.  Again, several witnesses – including fellow protestors, a presidential supporter, and a motorist – reported both that Rising-Moore shouted to police that he was in pain, and appeared to be in pain while Officer Wilson had his knees on Rising-Moore's neck and back.   Pl.'s Ex. 8: Johnson Aff. at ¶ 14;  Pl.'s Ex. 6: Lucas Aff. at ¶ 10; Pl.'s Ex. 7: Zelenka Aff. at ¶ 13; Pl.'s Ex. 5: Below Dep. at ¶ 13; Pl.'s Ex. 9: Inman Dep. at ¶ 11.  Officer Wilson also recalls Rising-Moore's complaints about the pain in his neck and back.  Defs.' Ex. B: Wilson Dep. at 48.

Apparently, Officer Wilson did not immediately handcuff Rising-Moore.  Rather, Officer Wilson held Rising-Moore's hands together, ostensibly while trying to decide what to do next.  Defs.' Ex. B: Wilson Dep. at 46-48.  Rising-Moore claims that he was not handcuffed until after the ten-minute period when Officer Wilson's knees were on his neck and back.  Pl.'s Ex. 11: Rising-Moore Dep. at 41.  Only after Officer Wilson decided to arrest Rising-Moore did he handcuff him.  Pl.'s Ex. 14: Wilson Dep. at 51-52.

Rising-Moore was arrested for: (1) resisting law enforcement by fleeing; (2) disorderly conduct for disrupting a lawful public assembly and creating a tumultuous environment by fighting; and (3) battery on a law enforcement officer.  Pl.'s Ex. 2: IPD

---

[12]  Rising-Moore claims that, at the time of this incident, he was still suffering from injuries to his neck and back that had resulted from a car accident in 2000.  Pl.'s Ex. 11: Rising-Moore Dep. at 59-60.

Case Report.  Officer Wilson admits that his actions in detaining Rising-Moore (Pl.'s Ex. 14: Wilson Dep. at 79-80) and in preferring the related criminal charges against Rising-Moore reflected the events he included in his official version of the encounter, and nothing more, that is, nothing political.  Id. at 42, 61.  In fact, Officer Wilson concedes that, by merely providing a physical barrier between Rising-Moore and the passing motorcade, he had fulfilled his duty to neutralize any potential threat to the President.  Id. at 74.  Officer Wilson asserts that the President's presence did not influence his decision to arrest Rising-Moore on these charges.  Id. at 73.  Furthermore, Officer Wilson admits that he did not intend to arrest Rising-Moore during his initial chase (Id. at 40) or even when Rising-Moore was finally kneeling down in the grass.   Id. at 42-43.

After his arrest, Rising-Moore was detained for seventeen days.[13]  Pl.'s Ex. 11: Rising-Moore Dep. at 52.  A jury acquitted Rising-Moore of the state criminal charges against him, and no federal charges were ever brought.  Id. pp. 53, 59.

According to Rising-Moore, he experienced muscle cramping in his neck and back, general body ache, and numbness in the left side of his face (lasting for approximately ten days) following his arrest.  Pl.'s Ex. 15: Rising-Moore Aff. at ¶ 8. Rising-Moore continues to take a muscle relaxant, an anti-inflammatory, and a painkiller as needed to treat his pain related to this injury.  Pl.'s Ex. 11: Rising-Moore Dep. at 61.

_____

[13]  Rising-Moore refused to pay bond for his release based "on principle."  Pl.'s Ex. 11: Rising-Moore Dep. at 53.

11

Rising-Moore has also used a transcutaneous electrical nerve stimulation[14] ("TENS") unit to stimulate his back and has undergone physical therapy.  Id. at 57-59.  Because Rising-Moore's pain has not subsided, his physicians are considering steroid injections at the base of his skull (Pl.'s Ex. 15: Rising-Moore Aff. at ¶ 9) and/or surgery.  Pl.'s Ex. 11: Rising-Moore Dep. at 60-61.

Rising-Moore filed his complaint in this action against Officer Wilson on December 2, 2003,[15]  alleging a civil rights violation for "unlawful seizure, in terms of the lack of probable cause for the arrest and the use of excessive force, in violation of the Fourth Amendment to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983" and state claims against the City of Indianapolis and Officer Wilson for false arrest and battery.  The Defendants moved for Summary Judgment on December 3, 2004, and the motion has been fully briefed by both sides.

Legal Analysis

I.  Summary Judgment Standard

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together

---

[14]  Although the parties mention only the acronym "TENS," we believe this refers to a transcutaneous electrical nerve stimulation unit – a device used to relieve pain.

[15]  Rising-Moore filed an amended complaint adding the City as a defendant on the state claims on February 17, 2004.

12

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Eiland v. Trinity Hosp., 150 F.3d 747, 750 (7th Cir.1998).

On a motion for summary judgment, the burden rests with the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the non-movant to "go beyond the pleadings" and point to evidence of a genuine factual dispute precluding summary judgment. Id. at 322-23. "If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court must enter summary judgment against her." Waldridge v. American Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986)); Celotex, 477 U.S. at 322-24; Liberty Lobby, Inc., 477 U.S. at 249-52.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. Waldridge, 24 F.3d at 920. Therefore, in considering a motion for summary judgment, we draw all reasonable inferences in favor of the non-movant. Venters v. City of Delphi, 123 F.3d 956, 962 (7th Cir. 1997). If genuine

13

doubts remain, and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate.  See Shields Enters., Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir.1992);  Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but mandated.  See Celotex, 477 U.S. at 322; Waldridge, 24 F.3d at 920.

The existence of disputed facts may also affect a determination on qualified immunity.  "At the summary judgment stage in § 1983 actions where the plaintiff has alleged a violation of the Fourth Amendment, the qualified immunity question is closely related, though not identical, to the question on the merits: whether the plaintiff has raised a triable issue regarding the constitutional violation."  Phelps v. City of Indianapolis, 2004 WL 1146489 at 12 (S.D. Ind. 2004).

In Estate of Bryant By Bryant v. Buchanan, 883 F. Supp. 1222 (S.D. Ind. 1995) (Barker, C.J.), this court denied summary judgment based on qualified immunity because the "'legal question of immunity [was] completely dependent upon which view of the facts [was] accepted by the jury.'" Id. at 1227 (quoting Adams v. Metiva, 31 F.3d 375, 387 (6th Cir. 1994)).  "Summary judgment is not appropriate if there are factual disputes involving an issue on which the question of immunity turns 'such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights.'" Id. (quoting Pray v. City of Sandusky, 49 F.3d 1154, 1160-1161 (6th Cir. 1995)).  See also Green v. Carlson, 826 F.2d 647, 652 (7th Cir. 1987) (holding "if there are issues

of disputed fact upon which the question of immunity turns, . . . the case must proceed to trial"); Estate of Gregory J. Palma v. Edwards, 2001 WL 1104716 at 3 (N.D. Ill. 2001) (noting that "summary judgment based on qualified immunity is not proper when the question of immunity turns on issues of disputed fact").

II.  Rising-Moore's Fourth Amendment Claims and Qualified Immunity[16]

Rising-Moore claims that Officer Wilson violated his Fourth Amendment rights by arresting him without probable cause and using excessive force in the course of the arrest. Defendants assert qualified immunity as one of their defenses to these claims.  We now address the issue of qualified immunity and its application in the special context of protecting the President.

A.  Qualified Immunity Test

Qualified immunity protects government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  "A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  Saucier v. Katz, 533 U.S. 194, 201 (2001).  To show that a

---

[16]  Defendants have moved for summary judgment on the merits, and, in the alternative, on grounds that Officer Wilson is entitled to qualified immunity.  Because extensive disputes pertaining to material facts prevent this court from ruling on qualified immunity, summary judgment on the merits is inappropriate.

defendant has violated a constitutional right, the plaintiff must either offer a closely

analogous case or provide evidence that the defendant's conduct was so patently violative

of a constitutional right that a reasonable officer would have known that such conduct

was unlawful.  Harlow, 457 U.S. 800; Hope v. Pelzer, 536 U.S. 730 (2002); Rice v.

Burks, 999 F.2d 1172, 1174 (7th Cir. 1993).  If the facts as alleged by the plaintiff reveal

no constitutional violation, the officer is entitled to qualified immunity.  Saucier, 533 U.S.

at 201.

On the other hand, "if a violation could be made out on a favorable view of the

parties' submissions, the next, sequential step is to ask whether the right was clearly

established."  Saucier, 533 U.S. at 201.  See also Marshall v. Tedske, 284 F.3d 765, 772

(7th Cir. 2002).  A right is clearly established if it would be clear to a reasonable officer

in that situation that his conduct was unlawful.  Saucier, 533 U.S. at 202; See also

Anderson v. Creighton, 483 U.S. 635, 640 (1987).  Therefore, it is not required that the

particular action in question previously have been held to be unlawful.  Rather, "in light

of pre-existing law the unlawfulness [of the officer's action] must be apparent."

Anderson, 483 U.S. at 640.

Furthermore, the officer's subjective beliefs are immaterial in asserting protection

by qualified immunity.  "Whether an official protected by qualified immunity may be

held personally liable for an allegedly unlawful action generally turns on the 'objective

legal reasonableness' of the action."  Anderson, 483 U.S. at 639 (quoting Harlow, 457

U.S. at 819).  The objective reasonableness test under the Fourth Amendment "requires

careful attention to the facts and circumstances of each particular case." Graham v. Connor, 490 U.S. 386, 396 (1989).

Necessarily, qualified immunity allows for reasonable errors and mistaken judgments by law enforcement officers.  Malley v. Briggs, 475 U.S. 335, 341 (1986) (stating that qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law").  The efficiency and expediency of law enforcement would suffer from a standard that subjected officers to suit for any mistake made under uncertain and rapidly evolving circumstances.  Hunter v. Bryant, 502 U.S. 224, 229 (1991); Davis v. Scherer, 468 U.S. 183, 196; Harlow, 457 U.S. at 806.

Moreover, the allowance for reasonable error "is nowhere more important than when the specter of Presidential assassination is raised."  Hunter, 502 U.S. at 229. Therefore, an official charged with protecting the President from any potential threat may justifiably infringe on an individual's Fourth Amendment rights to a greater extent than would be permissible in other circumstances.  See Watts v. United States, 394 U.S. 705, 707 (1969) (stating that the nation has an overwhelming interest in protecting its Chief Executive from threats of physical violence); Stigile v. Clinton, 110 F.3d 801, 803-04 (D.C. Cir. 1997) (rejecting Fourth Amendment challenge to random drug testing of employees with access to President based on overwhelming interest in protecting President and Vice President); Saucier, 533 U.S. at 208- 09 (recognizing special urgency of protecting Vice President).

Therefore, the fact that Officer Wilson was assigned to protect the President's

motorcade affects both our reasonableness analysis as well as our determination of the level of permissible intrusion on Rising-Moore's Fourth Amendment rights. Notwithstanding Officer Wilson's duty to protect the President, Rising-Moore claims that Officer Wilson lacked probable cause to arrest him and also that he used excessive force in the course of the arrest. We now examine the qualified immunity issues in light of Rising-Moore's Fourth Amendment claims.

> 1. Rising-Moore's § 1983 Claim that Officer Wilson Lacked Probable Cause for His Arrest

Probable cause is determined on the basis of the facts and circumstances within the knowledge of a law enforcement officer; probable cause exists if the officer reasonably believes that a suspect had committed a crime or was committing a crime. Beck v. Ohio, 379 U.S. 89, 91 (1964); United States v. Gilbert, 45 F.3d 1163, 1166 (7th Cir. 1995). Even if an officer is found to have lacked probable cause to arrest an individual, qualified immunity may still protect the officer from liability if it was objectively reasonable for the officer to believe that probable cause existed in the particular circumstances. Humphrey v. Staszak, 148 F.3d 719, 725 (7th Cir. 1998); See also Berry v. Lindenman, 2004 WL 1630510 at 3 (N.D. Ill. 2004) (stating that "qualified immunity protects police officers even if they make a reasonable mistake as to the existence of probable cause").

When a question about the existence of probable cause arises in a civil suit for damages, "it is a proper issue for the jury if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." Maxwell v.

City of Indianapolis, 998 F.2d 431, 434 (7th Cir. 1993).[17]  When "the arrestee challenges the officer's description of the facts and presents a factual account where a reasonable officer would not be justified in making an arrest, then a material dispute of fact exists," and summary judgment is inappropriate.  Morfin v. City of E. Chicago, 349 F.3d 989, 1000 (7th Cir. 2003) (denying summary judgment on officer's claim that he was entitled to qualified immunity because it was objectively reasonable for the officer to believe he had probable cause to arrest the plaintiff) (quoting Arnott v. Mataya, 995 F.2d 121, 124 (8th Cir. 1993)).

In this case, we cannot determine whether probable cause to arrest Rising-Moore existed, as a matter of law, due to the parties' contrasting factual accounts of what transpired.  Defendants argue that Officer Wilson had probable cause to arrest Rising-Moore for resisting law enforcement[18] because Officer Wilson ordered him to "stop and get back" yet he continued to run.  According to Defendants, probable cause to arrest Rising-Moore for disorderly conduct and battery arose after Rising-Moore hit Officer Wilson.  Furthermore, Officer Wilson alleges that Rising-Moore fled in the opposite direction after he hit Officer Wilson in the face.

---

[17]  A court may appropriately conclude that "probable cause existed as a matter of law . . . only when no reasonable jury could find that the officers did not have probable cause to arrest [the plaintiff]."  Maxwell, 998 F.2d at 434 (7th Cir. 1993).

[18]  Under Indiana Code § 35-44-3-3(a)(3), "[a] person who knowingly or intentionally . . . flees from a law enforcement officer after the officer has, by visible or audible means, identified himself and ordered the person to stop . . . commits resisting law enforcement, a Class A misdemeanor."

In contrast, Rising-Moore (as supported by various witnesses) insists that he never heard a directive to "stop." Rising-Moore claims that he discovered that the officer had been pursuing him only after Officer Wilson missed his tackle, at which point Rising-Moore immediately stepped into the grassy area next to the sidewalk, knelt to the ground and raised his hands.[19] Rising-Moore (again as allegedly supported by several witnesses) denies that he ever hit Officer Wilson or fled after seeing him.

Due to the parties' substantial disagreement as to these material facts, we cannot determine either whether probable cause existed to arrest Rising-Moore or whether Officer Wilson's belief that it existed was objectively reasonable in those circumstances. Rising-Moore's account suggests that Officer-Wilson never had probable cause to arrest him for any crime.[20] In contrast, Officer Wilson might be entitled to immunity if – as he maintains – Rising-Moore ignored the officer's directive, struck the officer, and then fled.

---

[19] Defendants argue that, even under Rising-Moore's factual account, Officer Wilson had probable cause to arrest Rising-Moore for resisting law enforcement because he stepped into the grass and turned his back to Officer Wilson after the officer missed his tackle. Defendants cite Potts v. City of Lafayette, 121 F.3d 1106 (7th Cir. 1997) as the authority for the proposition that even slight movement by Rising-Moore constituted resisting law enforcement. However, in Potts, the undisputed facts revealed that Potts tried to gain access to a Ku Klux Klan rally with a tape recorder. Potts then repeatedly disobeyed officers' orders that he could not bring the tape recorder into the rally and told an officer that he would have to arrest him. After making that statement, Potts then tried to move around the officer to gain access to the rally. The court found that probable cause existed to arrest Potts for resisting law enforcement because "[a]n officer has a right to enforce a lawful order even if that means arresting a person who verbally refuses to obey the order and then makes a movement in furtherance of his goal of disobedience." Id. at 1113 (7th Cir., 1997). Thus, Potts is clearly distinguishable from this case, making Defendants' argument on this point unconvincing.

[20] Neither party disputes Officer Wilson's right to briefly detain Rising-Moore akin to a Terry stop. Terry v. Ohio, 392 U.S. 1, 27 (1968) (holding that officers may briefly detain an individual based on reasonable suspicion of criminal activity).

These remaining factual disputes prevent us from ruling on qualified immunity, and thus preclude a grant of summary judgment.

Accordingly, we <u>DENY</u> Defendants' Motion for Summary Judgment on Rising-Moore's § 1983 claim that Officer Wilson lacked probable cause for his arrest.

2. <u>Rising-Moore's § 1983 Claim that Officer Wilson Used Excessive Force in Effecting His Arrest</u>

Like the probable cause analysis above, the excessive force analysis considers what an objectively reasonable officer would have viewed as appropriate and necessary force under similar circumstances. <u>Saucier</u>, 533 U.S. at 207. "Relevant factors in determining whether an officer's actions were objectively reasonable include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" <u>Jordan v. City of Indianapolis</u>, 2002 WL 32067277 at 7 (S.D. Ind. 2002) (quoting <u>Graham</u>, 490 U.S. at 396). The objective reasonableness of the officer's use of force is to be judged from the perspective of a reasonable officer in the particular circumstances – taking into account the exigencies and uncertainties of police work. <u>See Graham</u>, 490 U.S. at 396. Therefore, determining how much force is objectively reasonable is, again, a fact-sensitive question.

Once again, due to the striking factual disagreements between the parties, we cannot conclude that Officer Wilson is entitled to qualified immunity with respect to Rising-Moore's excessive force claim. According to Rising-Moore, Officer Wilson

21

attempted to tackle him without having ever issued an order to stop.  After Officer Wilson missed his tackle and Rising-Moore realized that the police officer was pursuing him, he maintains that he immediately knelt to the ground and offered no resistance to the officer's efforts to detain him.  Nonetheless, Rising-Moore claims, Officer Wilson slammed him to the ground and applied force with his knees to pin him to the ground for approximately ten minutes.

In contrast, Officer Wilson alleges that he did shout to Rising-Moore, ordering him to stop, yet Rising-Moore continued to run.  Then, according to Officer Wilson, when Rising-Moore failed to heed that directive, Officer Wilson grabbed Rising-Moore's arm as he caught up to Rising-Moore from behind.  Officer Wilson claims that at that point Rising-Moore turned and struck him in the face, and fled in the opposite direction.  After he had placed Rising-Moore on the ground, Officer Wilson claims that he put his knees on Rising-Moore's neck and back but only for a few minutes until he had handcuffed him.

These divergent portrayals of events prevent us from determining, as a matter of law, either whether Officer Wilson's use of force was objectively reasonable or whether he is entitled to immunity for his actions.  See Phelps v. City of Indianapolis, 2004 WL 1146489 at 11 (S.D. Ind. 2004) (stating that whether the officers' use of force was reasonable turns on conflicting testimony on material facts).  Rising-Moore's factual recitation could support a finding of a violation by Officer Wilson of Rising-Moore's Fourth Amendment rights, if he used excessive and injurious force on a compliant, non-

22

resisting subject who posed no threat to the safety of the President or others.

Correspondingly, Officer Wilson's version of the facts, if adopted, might have justified

use of greater force than otherwise, because Rising-Moore posed an immediate threat to

Officer Wilson and possibly the President of the United States.  Furthermore, if Rising-

Moore resisted arrest by striking Officer Wilson and then fleeing, Officer Wilson might

have a basis on which to avoid liability.  See Jordan, 2002 WL 32067277 at 7 (citing

relevant factors in determining objective reasonableness of an officer's use of force).  The

accounts of Rising-Moore and Officer Wilson are simply too disparate to allow the Court

to rule on qualified immunity, which again renders summary judgment inappropriate.  See

Estate of Bryant By Bryant, 883 F. Supp. at 1227 (S.D. Ind. 1995) (Barker, C.J.);  Green,

826 F.2d at 652 (7th Cir. 1987); Estate of Palma, 2001 WL 1104716 at 3.

Accordingly, we DENY the Defendants' Motion for Summary Judgment on

Rising-Moore's § 1983 claim that Officer Wilson used excessive force in effecting his

arrest.

III.  Rising-Moore's State Claims and Immunity under the Indiana Tort Claims Act

Rising-Moore claims that Officer Wilson's actions constituted false arrest and

battery under Indiana law.  In response, Defendants maintain that the Indiana Tort Claims

Act ("ITCA") shields them from liability.

The relevant portion of the ITCA provides:

> A governmental entity or an employee acting within the scope
> of the employee's employment is not liable if a loss results
> from:

...
(8)  The adoption and enforcement of or failure to adopt or
enforce a law (including rules and regulations), unless the act
of enforcement constitutes false arrest or false imprisonment.

Ind. Code § 34-13-3-3(8)

We next address the ITCA's immunity coverage as it relates to Rising-Moore's

state claims for false arrest and battery.

A.  <u>False Arrest</u>

By its own terms, the ITCA exempts false arrest from its immunity coverage.  Still,

actual or arguable probable cause precludes a claim for false arrest.  <u>Humphrey v.

Staszak</u>, 148 F.3d 719, 725 (7th Cir. 1998).  Probable cause exists if the facts and

circumstances known to the officer at the time justify a reasonable belief that the suspect

had committed a crime or was committing a crime.  <u>Conwell v. Beatty</u>, 667 N.E.2d 768,

775 (Ind. App.1996); <u>Miller v. City of Anderson</u>, 777 N.E.2d 1100, 1104 (Ind. App.

2002).  If the record as a whole reflects the existence of probable cause, a claim for false

arrest will fail.  <u>Conwell</u>, 667 N.E.2d at 775; <u>Garrett v. City of Bloomington</u>, 478 N.E.2d

89, 93 (Ind. App. 1985).  However, if the underlying facts relevant to a probable cause

determination are in dispute, the court should not decide the issue as a matter of law.

<u>Maxwell v. City of Indianapolis</u>, 998 F.2d 431, 434 (7th Cir. 1993).

As discussed above, the parties present dissimilar accounts of certain facts that are

vital to our analysis of whether probable cause existed to arrest Rising-Moore.  Although

Officer Wilson maintains that he ordered Rising-Moore to stop, Rising-Moore and

various witnesses insist that no such directive was ever issued.  Moreover, Rising-Moore

and certain witnesses wholly reject Officer's Wilson allegations that Rising-Moore struck

him in the face and fled.  Because the parties offer contrasting accounts of these material

facts on which the existence of either actual or arguable probable cause turns, we cannot

rule on the false arrest issue and summary judgment is thus inappropriate.  See Maxwell,

998 F.2d at 434; Morfin v. City of E. Chicago, 349 F.3d 989, 1000 (7th Cir. 2003).

Accordingly, we DENY Defendants' Motion for Summary Judgment on the state

false arrest claim.

### B.  Battery

Defendants ask the Court to enter summary judgment on Rising-Moore's state

battery claim because the ITCA immunizes Officer's Wilsons actions.  However, relevant

Indiana state law establishes that the ITCA does not automatically immunize police

officers from liability for state claims related to the use of excessive force.

The widespread disagreement and confusion regarding ITCA immunity for state

battery claims warrants a brief summary of the applicable legal principles.  In

Quakenbush v. Lackey, the Supreme Court of Indiana held that § 3(8) of the ITCA

confers immunity to law enforcement officials for breaches of public duties owed to the

public at large, but does not shelter officers who breach private duties owed to

individuals.  Quakenbush, 622 N.E.2d 1284, 1288 (Ind. 1993).  On the same day that

Quakenbush was decided, the Supreme Court of Indiana applied this public duty/private

duty test to an excessive force claim in Kemezy v. Peters, finding that law enforcement

officers owe a private duty to refrain from using excessive force in the course of making arrests, and that "the use of excessive force is not conduct immunized by Section 3[(8)]."[21]  Kemezy, 622 N.E.2d 1296, 1297 (Ind. 1993).

Six years later, in Benton v. City of Oakland City, 721 N.E.2d 224 (Ind. 1999), the Indiana Supreme Court criticized Quakenbush's public/private duty test.  Id. at 230. While the opinion from Benton did not expressly overrule Quakenbush, the Supreme Court thereafter explained that "Benton overruled the public/private duty test at common law." King v. Northeast Security, Inc., 790 N.E.2d 474, 482 (Ind. 2003).

Thus, Defendants argue, "the excessive force exception to ITCA immunity announced in Kemezy cannot be regarded as good law to the extent that it is based on the Quakenbush test."  City of Anderson v. Davis, 743 N.E.2d 359, 366 (Ind. App. 2001). It is significant to our analysis that the Supreme Court has not overruled Kemezy.  While Kemezy has been "called into question," the result has not changed.  O'Bannon v. City of Anderson, 733 N.E.2d 1, 3 (Ind. App. 2000).  In Phelps, Judge Hamilton (correctly, in our view) summarized the current state of the law on this issue:

> In considering questions of state law, the court must determine the issues as it believes the Indiana Supreme Court would. E.g., Trytko v. Hubbell, Inc., 28 F.3d 715, 719 (7th Cir. 1994); Dameron v. City of Scottsburg, 36 F. Supp. 2d 821, 831 (S.D. Ind. 1998). The state supreme court's decision in Kemezy is directly on point here, and the state court itself has not overruled it. This court cannot predict at this point that the state court will overrule the result in Kemezy, so as to

---

[21] § 3(8) was § 3(7) at this time, but the language remains the same.

> leave citizens with no recourse under state law if police
> officers use unlawful force against them, even if the court
> might use a different analysis in the future.[22]

Phelps, 2004 WL 1146489 at 15.

Consistent with the holding in Kemezy, we conclude that police officers and the governmental entities that employ them can be found liable for battery claims despite the ITCA's extensive immunity coverage.  Unless and until the Indiana Supreme Court overrules Kemezy, we cannot conclude as a matter of law that Defendants are immune from liability for Rising-Moore's battery claim based solely on the ITCA.

Accordingly, we DENY Defendants' Motion for Summary Judgment on Rising-Moore's state battery claim.

Conclusion

As explained above, we DENY Defendants' Motion for Summary Judgment on Plaintiff's § 1983 claim and state claims.  IT IS SO ORDERED.

Date: 07/07/2005

_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copy to:

_____

[22]  In another case decided ten days after Phelps, Judge Hamilton incorporated this precise holding in denying police officers' motions for summary judgment on state tort claims related to their alleged use of excessive force.  Estate of O'Bryan v. Town of Sellersburg, 2004 WL 1234215 at 24 (S.D. Ind. 2004).

Paul Thomas Belch
LAW OFFICE OF ST. PAUL TRAVELERS
pbelch@stpaultravelers.com

David Robert Brimm
WAPLES & HANGER
dbrimm@wapleshanger.com

Jaunae M. Hanger
WAPLES & HANGER
hangerj@iquest.net

John F. Kautzman
RUCKELSHAUS ROLAND KAUTZMAN BLACKWELL & HASBROOK
jfk@rucklaw.com

Andrew J. Mallon
OFFICE OF CORPORATION COUNSEL
amallon@indygov.org

John C. Ruckelshaus
RUCKELSHAUS ROLAND KAUTZMAN BLACKWELL & HASBROOK
jcr@rucklaw.com

Richard A. Waples
WAPLES & HANGER
richwaples@aol.com

28